**United States District Court**
**District of Nebraska**

| | |
|---|---|
| Mitchell Hofer, | Case No.  8:24-cv-398 |
| Plaintiff, | |
| v. | Complaint and Jury Demand |
| Bennington Public School District, | |
| Defendant. | |

## I.    Introduction

1.      Mitchell Hofer is a 41-year-old, married father of two. He was a teacher in the Bennington School District ("the District"), saw it as his vocation, and anticipated teaching in the District for years to come.

2.      His duties included coaching the Bennington Badgers Forensics Team which competed in competitions organized and sponsored by the Nebraska School Activities Association ("NSAA").

3.      As Mr. Hofer lead the Forensics team, a female student and member of the team filed two complaints accusing Mr. Hofer of sexual harassment. Neither complaint alleged conduct qualifying as sexual harassment within applicable laws, regulations and policies. Neither should have been formally investigated. Both were false. Both were ultimately dismissed as meritless.

4.      Nonetheless, the District placed Mr. Hofer on administrative leave for three months and then refused his return to his classroom, causing him tremendous emotional

1

and reputational harm, and ultimately ending his career with the District though he had violated no school policy and though he had done nothing wrong.

5.      During the investigation, the District provided the female, and female witnesses, favorable treatment and him unfavorable treatment on like issues. The District also failed to follow many, most or all applicable Title IX regulations or School Board policies governing the handling of the student's complaint. The District chose this course of action in the wake of a contentious Title IX lawsuit filed on behalf of other female students while under a Consent Decree entered in the lawsuit requiring adherence to Title IX provisions prohibiting discrimination against female students.

6.      Mr. Hofer seeks damages pursuant to Title IX for the diminished earning capacity, damage to his reputation, and emotional harm the District's discriminatory conduct caused.

## II.    Parties and Jurisdiction

7.      At all relevant times herein, Mitch Hofer was a citizen of the United States of America and a resident of Douglas County, Nebraska. At all relevant times, he was employed by the Bennington School District as the AP United States History Teacher and Head Forensics Coach.

8.      Defendant Bennington Public Schools is a public school district located in Bennington, Nebraska (hereinafter, the "District"). At all relevant times herein, the District was a duly organized body corporate, and acted through its Board of Education; its Superintendent, Terry Haack; and its Title IX Coordinator, Whitney Fagan.

9.     At all relevant times, the District had the power under Nebraska law to sue and be sued.

10.    At all relevant times, the District has received and continues to receive federal financial assistance and the benefits derived therefrom, and is therefore subject to the requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. ("Title IX") and the regulations adopted thereto.

11.    All relevant events occurred in Douglas County, Nebraska.

12.    Jurisdiction is proper pursuant to 28 USC Section 1343.

### III.    Bennington Badgers Forensics team

13.    Part of Mr. Hofer's duties pursuant to his employment with the District was to coach the Bennington Badgers High School Forensics Team (or "Speech Team") beginning in 2018.

14.    Elizabeth Janssen was the Assistant Coach of the Forensics Team.

15.    Prior to his employment in Bennington, Mr. Hofer taught for ten years in Crofton, Nebraska where he led the Forensics team to a State Championship and two Runner-Up Titles.

16.    The forensics team is composed of academically eligible high school students who are selected after a tryout and who agree to a "Badgers Speech Behavior Contract."

17.    Central provisions of the contract require a student's agreement to remain academically eligible, attend practices, compete in forensics meets. These include a National Qualifier, a District Tournament, and a State tournament sponsored by NSAA.

18.    Forensics competitions involve students performing oral interpretation and acting to communicate to an audience a work of literary art while remaining true to the art's intellectual, emotional, and aesthetic purpose, functioning as a liaison between the author of the literature and the audience who responds to it.

19.    Students on the forensics team compete in individual and group events in different categories, including but not limited to interpretation of humorous prose and interpretation of serious prose.

20.    One of the first steps on the journey to a competition is to work collaboratively with the Coach to choose, in compliance with the Nebraska School Activities Association Speech Manual, a work of art to interpret in competition.

21.    J.P., a student whose name is known to Defendants, participated on the forensics team during the 2021-22 school year.

22.    Both J.P.'s mother and J.P.'s father are active in the affairs of the school District. J.P.'s father is currently a candidate for the Bennington School Board.

### IV.    J.P.'s First Complaint -- Dismissed

23.    On October 12, 2021, J.P. expressed to Mr. Hofer she may want to perform a humorous speech and wondered if a script could be derived from the movie "Napoleon Dynamite" or another comedy. In response, Mr. Hofer suggested, among other ideas, a humorous script based upon the movie "Bad Teacher" instead. This was, in part, due to his belief some of the characters in Napolean Dynamite were built on racist tropes.

24.    After the meeting, Mr. Hofer sent an e-mail to J.P. directing her to consult with her parents before watching the movie. J.P. watched the movie with her mother's

approval prior to her next meeting with Mr. Hofer regarding the script she would perform.

25.    J.P. next met with Mr. Hofer on October 18, 2021. At the meeting, Mr. Hofer provided J.P. with a script with potentially offensive parts already cut out. This was consistent with NSAA guidelines.

26.    To provide an example of physical comedy that could be derived from the movie and performed during any competition, Mr. Hofer pantomimed, in a humorous and funny manner, a scene from the movie involving a teacher taking off her bra and handing it to a male student.

27.    Mr. Hofer also provided J.P. with a script where he highlighted portions of the movie script that could be used to build a performance piece consistent with NSAA guidelines.

28.    Mr. Hofer made clear to J.P. that any inappropriate parts of the movie script would be cut out and that J.P. would perform only parts with which she was comfortable.

29.    Relying upon the two meetings regarding potentially performing a scene from "Bad Teacher," and before the script's development was complete, J.P. filed a formal complaint alleging sexual harassment on October 25, 2021.

30.    In her complaint, J.P. also alleged an incident where Mr. Hofer allegedly singled J.P. out when mentioning to a group of four students that his daughter was being bullied at school. J.P.'s claims in this respect were inconsistent with every other witness interviewed regarding the occurrence.

31.    J.P.'s complaint also alleged that Mr. Hofer sent her inappropriate emails.

32.     All were sent from Mr. Hofer's school e-mail account to J.P.'s school e-mail account. Accordingly, all were accessible to and reviewed by school officials. None of the emails could be construed as sexual in any manner, however subtle:

    a.  None refer to sex or sexual activity;

    b.  None refer to J.P.'s appearance or clothing;

    c.  None suggest the two spend extra time together.

33.      Responses sent by J.P. to the emails do not suggest she was uncomfortable receiving them.

34.     Though the limited number emails complained of were sent over the course of a period lasting at least five months, J.P. presented no evidence that she ever complained of or expressed concern regarding the communications to her friends, family, or school personnel.

35.     After a school investigator assigned to J.P.'s complaint interviewed two witnesses, J.P. initially declined to participate in an interview. However, she later changed her mind after being provided with a summary of Mr. Hofer's interview. She then requested an interview and, when it was granted, added more allegations to her complaint.

36.     On February 7, 2022, the Superintendent found Mr. Hofer had not engaged in any activities violating School Board policies addressing sexual harassment as defined by Title IX, 34 USC § 106.

37.     J.P.'s first complaint was dismissed.

## V.    J.P.'s Second Complaint -- Dismissed

38.    After her first complaint had been submitted to but not yet decided by the Superintendent, J.P. filed a second formal complaint on January 23, 2022.

39.    Because J.P.'s second complaint dated back to the same September and October 2021 timeframe as her first complaint, she could have been expected to include her allegations in the first complaint.

40.    In her second complaint, J.P. accused Mr. Hofer of choosing a script for another speech student to threaten or sexually harass J.P.

41.    There were at least three other obvious problems with J.P.'s second complaint. First, it was the other student, M.P., not Mr. Hofer, who first proposed and then chose the book for her script.

42.    Second, Mr. Hofer did not require M.P. to perform a script based upon the book. The other student chose to use the book and expressed no concerns to Mr. Hofer, Ms. Janssen, her family or friends that she did not wish to perform it. To the contrary, M.P. enthusiastically participated in the process of editing the script.

43.    Third, J.P. was not aware of M.P.'s script topic, the book upon which it was based, or the supposed basis of her sexual harassment claim until just prior to filing her complaint in January 2022. This meant J.P.'s allegation was that Mr. Hofer was somehow sexually harassing her without her knowledge.

44.     Additionally, Mr. Hofer had required a discussion with, and permission from, M.P.'s parents before he would allow her to even read the book before making a decision.

45.     The other student performed the script and won numerous speech competitions.

46.     On April 14, 2022, the Superintendent again found Mr. Hofer had not engaged in any activities violating School Board policies addressing sexual harassment as defined by Title IX, 34 USC § 106.

47.     J.P.'s second complaint was also dismissed.

## VI.     Process for Handling Complaints

48.     All schools governed by Title IX of the Education Amendments Act of 1972, which prohibits sex discrimination in educational programs, are required to employ and train personnel competent to comply with federal laws and regulations governing the handling of complaints like those made by J.P.

49.     Legislators included the provisions to protect falsely accused teachers.

50.     The regulation published at 34 CFR §106.45, among others, governed the District's handling of J.P.'s complaints. A copy of the 34 CFR §106.45 in effect at relevant times is attached hereto as Exhibit 1.

51.     Board policies 404.12R1 and 504.24R1 also governed the District. The policies are attached as Exhibits 2 and 3, respectively.

52.    The District employed a Title IX Coordinator named Whitney Fagan, whose included the investigation of complaints of sexual harassment and other administrative duties.

53.    Among other provisions, federal regulations required complaints that do not allege conduct amounting to sexual harassment be dismissed without investigation.

54.    Regulations also required fair and impartial investigation of complaints through a formal grievance process when sexual harassment is adequately alleged.

55.    Regulations also require the accused enjoy basic due process, including adequate notice of allegations, a fair opportunity to defend the allegations by gathering and presenting evidence, and a decision by an impartial decision maker.

## VII.    Arbitrary, Discriminatory Treatment of Mr. Hofer

56.    Both complaints filed by J.P. were utterly meritless on their face and failed to allege conduct within the definition of prohibited sexual harassment.

57.    Title IX regulations require dismissal if the conduct alleged in the formal complaint would not constitute sexual harassment even if proved.

58.    Instead of dismissing the complaints, the District conducted improper informal investigations followed by inequitable, untimely formal investigations violating numerous School Board policies, federal regulations and Mr. Hofer's rights to due process.

59.    As to the first complaint, the District issued a letter to Mr. Hofer to the effect that the allegations did not rise to the level of sexual harassment. And as to both

9

complaints, the written determinations finally issued also make clear the allegations did not rise to the level of Title IX sexual harassment, even if they had been proven true (and they had not).

60.     Nonetheless, the school's Principal, in response to J.P.'s first complaint, and with the participation or involvement of the Title IX Coordinator, Whitney Fagan, and Superintendent Terry Hack, conducted an informal investigation without providing notice to Mr. Hofer of the allegations made by the complainant student or her parents. This violated applicable policies and regulations.

61.     When J.P. filed her second complaint, the District was almost immediately in possession of sufficient exculpatory information to establish the complaint lacked merit. Specifically, Mr. Hofer had notified the Title IX Coordinator he had spoken to the principal and obtained approval for his alleged wrongful actions and also provided e-mail evidence proving some of the allegations were untrue.

62.     When the District proceeded with an investigation nonetheless, the Title IX Coordinator either refused to interview the principal or chose to leave his interview summary out of her investigative report even though he was a key witness in the investigation.

63.     The District also failed, again in violation of Title IX regulations, to ensure that its Title IX Coordinator was properly trained regarding her duty to conduct a thorough and impartial investigation as a part of the formal grievance process.

64.     With its insufficiently trained Title IX Coordinator conducting the unnecessary and improper formal investigation, the District disregarded its obligation to

comply with Title IX regulations during the formal grievance process related to both complaints, to wit:

    a.  By interviewing Mr. Hofer in late October, 2021 as part of an informal investigation, prior to providing him with written notice of the allegations or notice of his rights under Title IX.

    b.  By failing to provide Mr. Hofer with written notice of the allegations and of his rights, providing instead only the formal complaint on November 2, 2021.

    c.  While allowing the student complainant, her parents, and student witnesses to speak with one another and publicize information regarding the investigation, the District and its Title IX Coordinator restricted Mr. Hofer's ability to discuss the allegations being investigated by instructing Mr. Hofer and his attorney he could not contact any students listed within the complaint while the District was conducting its investigation, thus silencing Mr. Hofer in a manner the female complainant was not, impeding his ability to gather and present evidence, and causing Mr. Hofer to fear he could be subjected to disciplinary action for insubordination if he exercised his right to contact other students.

    d.  By refusing to interview witnesses or review documents identified and submitted by Mr. Hofer, denying Mr. Hofer an impartial investigation and equal opportunity to respond to the allegations.

e.  By refusing to allow Mr. Hofer to present relevant information from witnesses and exculpatory evidence during the first complaint grievance process.

f.  By refusing to allow Mr. Hofer, when interviewed during the second grievance process, to provide information that was not covered by the Coordinator's questions but were related and relevant to the formal complaint that had been provided to him. Neither J.P nor her witnesses were restricted in this manner when interviewed.

g.  By failing to provide Mr. Hofer adequate notice of the allegations of the second complaint in January 2022. Mr. Hofer was provided notice of one alleged incident date and one location that did not align with the contents of the redacted formal complaint provided, which involved several dates, places, named and unnamed people and significant hearsay and vagueness, leaving Mr. Hofer unclear as to the conduct the District was investigating that allegedly constituted sexual harassment. Upon request for clarification by Mr. Hofer, the District further violated applicable regulations by refusing to clarify the specific allegations and policy violations, leaving Mr. Hofer unsure how to prepare for an interview or determine what evidence or witnesses he should submit.

h.  Contrary to the Title IX Coordinator's refusal to interview witnesses and review documents submitted by Mr. Hofer during the first grievance process, the Title IX Coordinator interviewed all or most of the speech

students during the second grievance process, asking broad questions completely unrelated to the allegations of the complaint. The Title IX Coordinator then included the student responses in evidence and the District relied upon the statements when refusing to allow Mr. Hofer to return from leave. The District did so without providing Mr. Hofer the benefit of being informed of the specific allegations being made and relied upon and without asking Mr. Hofer questions regarding the allegations or otherwise provide him an opportunity to respond thereto. Even when Mr. Hofer specifically requested an opportunity to consult with his legal counsel about potentially clarifying or adding to his responses by providing information not covered by the questions asked by the Title IX Coordinator, the District representative interjected and denied the opportunity.

i. By including hearsay and sensitive information within investigative reports while not taking any steps to prevent that information from being widely distributed, causing significant reputational harm to Mr. Hofer and resulting in such information being shared among students, teachers, parents, the educational community, the Bennington community and the general public during both grievance processes and thereafter.

j. By failing to conclude either the first or second grievance process in a timely manner while simultaneously failing to provide notice and an explanation of good cause of the delays. These lengthy delays caused significant harm primarily and unequally to Mr. Hofer as he was placed on

administrative leave pending the outcome of the second complaint while the student complainant was able to attend school and participate in activities without limitation or accountability for false information she provided during the investigation. Indeed, the District apparently relied, in part, on its own 20-day delay in processing the second complaint when deciding to not allow Mr. Hofer to return to the classroom despite both complaints being resolved completely in his favor.

65.     Even after both formal complaints were resolved in Mr. Hofer's favor, the District continued to informally investigate other concerns, again without notifying Mr. Hofer of the investigation or the subjects of the investigation.

66.     Even though the District's policies prohibit presentation of false information during an investigation, and information provided by J.P. and some student witnesses conflicted, and some allegations were demonstrably false, the Title IX Coordinator's summaries and reports reflect no effort to examine the credibility of the witnesses, resolve discrepancies in their reports, or hold any student accountable for making false reports. The failure or refusal to make credibility determinations and hold the students accountable for providing false information caused significant reputational harm to Mr. Hofer as it allowed false allegations and rumors to flourish throughout the grievance process and thereafter.

67.     During both investigations, Mr. Hofer was subjected to disparate treatment based on his gender. Though the female student was informed of and provided supportive measures, Mr. Hofer was not informed of his right to supportive measures upon receipt of

the first complaint in early November 2021, resulting in Mr. Hofer not being offered leave (including FMLA leave) or counseling services for stress and anxiety for several months.

68.    Worse, the District placed Mr. Hofer on administrative leave for three months and then refused to allow him to return to the classroom, even after both complaints were resolved completely in his favor, causing Mr. Hofer significant emotional and reputational harm. The District also required Mr. Hofer to use a different door to enter the school, eat lunch at a different time, and monitor study hall rather than perform his normal teaching duties, a demotion by any standard.

69.    The District retaliated against Mr. Hofer for participating in the grievance processes by placing him on administrative leave and then refusing to allow him to return to the classroom. This was demonstrably unnecessary, arbitrary and unreasonable since Mr. Hofer remained teaching in the classroom for over three months without issue or incident following the first complaint.

70.    Though the District offered continued employment in a demoted role, it conditioned the offer on resignation of Mr. Hofer from his previous position and acceptance of the demotion.

71.    The District further contributed to the unnecessary harm caused to Mr. Hofer's reputation when, with the principal's participation, the school published an article in the school newspaper informing the school community that Mr. Hofer's administrative leave caused a "revolving door of substitute teachers" and stress for students in his classes. The article was published during a time when significant false rumors were

15

circulating about Mr. Hofer, such that the false rumors and the article combined to cause further unnecessary reputational harm.

72. Each of the foregoing violations of applicable regulations and Board policies has been detailed previously in correspondence to the Board of Education dated July 27, 2022 and in a Tort Claim letter sent July 21, 2022.

73. Each of the foregoing actions of the District were taken knowing they provided the female student unfairly favorable treatment in violation of Mr. Hofer's rights, caused Mr. Hofer unfair prejudice in defending the allegations, and caused Mr. Hofer to suffer unnecessary emotional and reputational harm.

74. Prior to its conduct alleged herein, three Bennington families sued the District in March 2021 demanding equal treatment for female student athletes.

75. The litigation was settled by entry of a Consent Decree on July 19, 2021. The District agreed, by consent to entry of the Decree to, *inter alia*, "to comply with the general mandates of Title IX, its regulations, and its interpretive guidance."

76. The District's Title IX Coordinators, including the same Coordinator who investigated J.P.'s complaints against Mr. Hofer, are responsible under the Decree to ensure the District's compliance "with Title IX and this Consent Decree, including:

Keeping current the School Board's Grievance Procedure on the School District's website, presently available at [URL], applicable to complaints of discrimination and the procedure for filing a grievance, and other information which arises with respect to the School District's Title IX

16

obligations, whether raised by School District employees, parents or students."

77.     As a result of the litigation, the District was ordered to pay attorney's fees in excess of $144,000.00.

78.     On information and belief, the school has been formally accused of other Title IX violations.

79.     On information and belief, one or more District officials or Board Members exerted pressure on the Title IX Coordinator to investigate J.P.'s complaints and conduct the grievance process in the manner alleged above herein in an effort to support female students against perceived inappropriate behaviors of male school officials, and at the very least, to avoid further litigation brought on behalf of J.P. or other female students.

80.     On information and belief, J.P.'s parents demanded the District place Mr. Hofer on administrative leave, insisted the leave be continued even after the investigations were concluded in Mr. Hofer's favor, and encouraged the District to terminate Mr. Hofer's employment.

81.     On information and belief, J.P.'s parents supported the District's decision to disallow Mr. Hofer's return to the classroom and opposed his return to the classroom.

## VIII.   Harm Suffered

82.     Each of the District's actions, as alleged above herein, caused Mr. Hofer stress and distress, trauma, anxiety, emotional harm and the loss of dignity. A devoted and

successful teacher, a son of teachers, and a provider for his family, the District took Mr. Hofer's career away with no basis whatsoever.

83.     The District's actions, as alleged above herein, caused lost wages, loss of economic employment benefits, and diminished earning capacity in an amount to be proven at trial but at least $225,000.00.

84.     The District Court's actions caused economic damages related to education in the sum of at least $32,000.00.

85.     The District Court's actions resulted in economic loss for attorney's fees in the approximate sum of $50,000.00 for defense of the allegations.

86.     The loss of his career caused Mr. Hofer personal stress, distress, trauma, anxiety and loss of dignity.

87.      The loss of his career caused Mr. Hofer and his family financial strain resulting in stress, anxiety and loss of dignity.

88.     The emotional harm suffered by Mr. Hofer strained his relationship with his family.

89.     The District's actions caused reputational harm, including wildly false rumors he had sexually assaulted a student.

90.     The District's actions impacted Mr. Hofer's relationships in his faith community.

91.     The emotional harm required, and still requires, weekly therapeutic treatment at a reasonable cost totaling an amount to be proven at trial but at least as much as $40,000.00.

## IX.    Claims for Relief

92.    The allegations made in paragraphs 1 through 91 above herein are incorporated as if fully set forth here.

93.    The Bennington Public School District receives federal financial assistance from the Department of Education and is obligated to comply with Title IX of the Education Amendments Act of 1972 which prohibit sex discrimination in educational programs.

94.    The District has discriminated against Mr. Hofer based upon his gender by, *inter alia*, conducting unnecessary formal grievance procedures; by treating him unfairly and inequitably during said procedures based upon his gender, by repeatedly violating his rights to due process in the course of the informal investigation process and formal grievance procedures; by repeatedly violating applicable federal regulations in the course of the informal investigation process and formal grievance procedures, as alleged above herein; and by subjecting him to disparate treatment based upon his gender, as alleged above herein.

95.    The District acted arbitrarily, unreasonably, and in bad-faith by placing Mr. Hofer on administrative leave, by continuing to require he remain on leave in the absence of a reasonable basis for doing so, and by refusing to allow him to return to the classroom after J.P.'s complaints, which failed to state a claim of sexual harassment in the first instance, were resolved in his favor.

96.     The District's actions were the sole and proximate cause of the economic damages, emotional and reputational harm as alleged above herein.

## X.     Prayer for Relief

97.     Based on the foregoing, Mitch Hofer respectfully requests judgment as follows:

1) Special damages for lost wages and diminished earning capacity.

2) Special damages for the cost of attorney fees.

3) Special damages for the cost of medical and therapeutic care.

4) Compensatory damages for the stress and distress, trauma, anxiety, emotional harm and the loss of dignity suffered.

5) Compensatory damages for the violation of his Constitutional and statutory rights, including but not limited to his right to be treated equally under the law and free of discrimination based upon his gender.

6) Attorney's fees pursuant to 42 USC §1988;

7) Costs of suit; and

8) Such other and further relief as the court may deem just and proper.

## XI.     Demand for Jury Trial

98.     Plaintiff demands trial by jury of all issues so triable.

MITCHELL HOFER, PLAINTIFF

By:      /s/ *Adam J. Sipple*
          Adam J. Sipple, #20557
          SIPPLE LAW
          12020 Shamrock Plz
          Suite 200
          Omaha, NE 68154
          402.778.5055
          adam@sipple.law